**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED MAY 7, 2008

NATIONAL PRIDE AT WORK, INC.,
BECKY ALLEN, DORTHEA
AGNOSTOPOULOS, ADNAN AYOUB,
MEGHAN BELLANGER, JUDITH
BLOCK, MARY M. BRISBOIS, WADE
CARLSON, COURTNEY D. CHAPIN,
MICHAEL CHAPMAN, MICHELLE
CORWIN, LORI CURRY, JOSEPH
DARBY, SCOTT DENNIS, JIM
ETZKORN, JILL FULLER, SUSAN
HALSEY-CERAGH, PETER HAMMER,
DEBRA HARRAH, TY HIITHER,
JOLINDA JACH, TERRY KORRECK,
CRAIG KUKUK, GARY LINDSAY,
KEVIN McMANN, A.T. MILLER, KITTY
O'NEIL, DENNIS PATRICK, TOM
PATRICK, GREGG PIZZI, KATHLEEN
POELKER, JEROME POST, BARBARA
RAMBER, PAUL RENWICK, DAHLIA
SCHWARTZ, ALEXANDRA STERN,
GWEN STOKES, KEN CYBERSKI,
JOANNE BEEMON, CAROL BORGESON,
MICHAEL FALK, and MATT SCOTT,

       Plaintiffs-Appellees,

v                           No. 133429

GOVERNOR OF MICHIGAN,

       Defendant-Appellant,

and

CITY OF KALAMAZOO,

 Defendant-Appellee,

and

ATTORNEY GENERAL,

 Intervening Defendant-
 Appellee.

NATIONAL PRIDE AT WORK, INC.,
BECKY ALLEN, DORTHEA
AGNOSTOPOULOS, ADNAN AYOUB,
MEGHAN BELLANGER, JUDITH
BLOCK, MARY M. BRISBOIS, WADE
CARLSON, COURTNEY D. CHAPIN,
MICHAEL CHAPMAN, MICHELLE
CORWIN, LORI CURRY, JOSEPH
DARBY, SCOTT DENNIS, JIM
ETZKORN, JILL FULLER, SUSAN
HALSEY-CERAGH, PETER HAMMER,
DEBRA HARRAH, TY HIITHER,
JOLINDA JACH, TERRY KORRECK,
CRAIG KUKUK, GARY LINDSAY,
KEVIN McMANN, A.T. MILLER, KITTY
O'NEIL, DENNIS PATRICK, TOM
PATRICK, GREGG PIZZI, KATHLEEN
POELKER, JEROME POST, BARBARA
RAMBER, PAUL RENWICK, DAHLIA
SCHWARTZ, ALEXANDRA STERN,
GWEN STOKES, KEN CYBERSKI,
JOANNE BEEMON, CAROL BORGESON,
MICHAEL FALK, and MATT SCOTT,

 Plaintiffs-Appellants,

v                                              No. 133554

GOVERNOR OF MICHIGAN and CITY
OF KALAMAZOO,

      Defendants,

and

ATTORNEY GENERAL,

      Intervening Defendant-
      Appellee,

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to appeal to consider whether the marriage amendment, Const 1963, art 1, § 25, which states that "the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose," prohibits public employers from providing health-insurance benefits to their employees' qualified same-sex domestic partners. Because we agree with the Court of Appeals that providing such benefits does violate the marriage amendment, we affirm its judgment.

## I. FACTS AND HISTORY

The marriage amendment, Const 1963, art 1, § 25, was approved by a majority of the voters on November 2, 2004, and took effect as a provision of the Michigan Constitution on December 18, 2004. At that time, several public employers, including state universities and various city and county governments, had policies or agreements in effect that extended health-insurance benefits to

their employees' qualified same-sex domestic partners. In addition, the Office of the State Employer (OSE) and the United Auto Workers Local 6000 (UAW) had reached a tentative agreement to include same-sex domestic-partner health-insurance benefits in the benefit package for state employee members of the union. However, on December 2, 2004, the OSE and the UAW agreed not to submit the proposed contract to the Civil Service Commission until after there had been a court determination that the language of the proposed contract did not violate the marriage amendment.

On March 16, 2005, in response to a state representative's request for an opinion regarding the marriage amendment's effect on the city of Kalamazoo's ability to provide same-sex domestic-partner health-insurance benefits to its employees, the Attorney General issued a formal opinion, concluding that the city's policy did violate the amendment. The Attorney General asserted that "Const 1963, art 1, § 25 prohibits state and local governmental entities from conferring benefits on their employees on the basis of a 'domestic partnership' agreement that is characterized by reference to the attributes of a marriage." OAG, ___, No 7,171, p ___ (March 16, 2005), 2005 Mich Reg 5, p 35.

On March 21, 2005, plaintiffs[1] filed this declaratory judgment action against the Governor, seeking a declaration that the marriage amendment does not bar public employers from providing health-insurance benefits to their employees' qualified same-sex domestic partners. After the city of Kalamazoo announced its intention not to provide same-sex domestic-partner health-insurance benefits to its employees for contracts beginning in January 2006 absent a court ruling that such benefits do not violate the marriage amendment, plaintiffs added the city of Kalamazoo as a defendant. The Attorney General, acting on behalf of the Governor, moved to dismiss plaintiffs' suit. The Governor obtained separate counsel, who withdrew the motion to dismiss and filed a brief supporting plaintiffs. The Attorney General then intervened in his own right and adopted the brief that he had initially filed on the Governor's behalf as his own.

The trial court granted plaintiffs' motion for summary disposition and declared that the marriage amendment does not bar public employers from

---

[1] Plaintiff National Pride at Work, Inc., is a nonprofit organization of the American Federation of Labor–Council of Industrial Organizations. The remaining plaintiffs are employees of the city of Kalamazoo, the University of Michigan, Michigan State University, Eastern Michigan University, Wayne State University, the Clinton/Eaton/Ingham County Community Mental Health Board, or the state of Michigan and those employees' same-sex partners. Because the benefit plans of Eastern Michigan University, Wayne State University, and the Eaton/Clinton/Ingham Community Mental Health Board are not part of the record, they are not discussed. Likewise, this opinion does not address whether private employers can provide health-insurance benefits to their employees' same-sex domestic partners.

providing health-insurance benefits to their employees' qualified same-sex domestic partners. The court held that health-insurance benefits do not constitute one of the "benefits of marriage." Unpublished opinion of the Ingham Circuit Court, issued September 27, 2005 (Docket No. 05-368-CZ), p 7. The court further held that the "criteria [used by the public employers] also do not recognize a union 'similar to marriage'" because the "criteria, even when taken together, pale in comparison to the myriad of legal rights and responsibilities accorded to those with marital status." *Id.* at 9.

The Attorney General appealed and moved for a stay. The Court of Appeals granted the motion for a stay and reversed the trial court, declaring that the marriage amendment does bar public employers from providing health-insurance benefits to their employees' qualified same-sex domestic partners. *Nat'l Pride at Work, Inc v Governor,* 274 Mich App 147; 732 NW2d 139 (2007). The Court of Appeals held that "a publicly recognized domestic partnership need not mirror a marriage in every respect in order to run afoul of article 1, § 25 because the amendment plainly precludes recognition of a 'similar union for any purpose.'" *Id.* at 163. "All the plans listed establish criteria for eligibility that are similar to those for marriage." *Id.* at 164. "[T]he agreement between the employee and the dependent constitutes a union similar to marriage, because with the agreement (as with a marriage), the employer has a legal obligation to

6

recognize the union and provide benefits to the eligible dependent (as with a spouse)." *Id*. Finally,

> [t]he requirement that an employee prove the existence either of a written domestic-partnership agreement or an agreement between the employee and the dependent to be jointly responsible for basic living and household expenses, in order to establish eligibility by the partner or dependent for insurance coverage, constitutes recognition by the public employer of a 'similar union for any purpose,' i.e., the purpose of extending to domestic partners and dependents the benefit of insurance coverage equivalent to coverage that is extended to spouses. [*Id.* at 165.]

Plaintiffs and the Governor appealed, and this Court granted the applications for leave to appeal. 478 Mich 862 (2007).

## II. STANDARD OF REVIEW

A trial court's decision to grant a motion for summary disposition is reviewed de novo. *Goldstone v Bloomfield Twp Pub Library*, 479 Mich 554, 558; 737 NW2d 476 (2007). Questions of constitutional interpretation are also reviewed de novo. *Id.*

## III. ANALYSIS

### A. DOMESTIC-PARTNERSHIP POLICIES

The tentative agreement reached by the OSE and the UAW would require domestic partners to meet the following criteria in order to receive health-insurance benefits:

1. Be at least 18 years of age.

2. Share a close personal relationship with the employee and be responsible for each other's common welfare.

7

3. Not have a similar relationship with any other person, and not have had a similar relationship with any other person for the prior six months.

4. Not be a member of the employee's immediate family as defined as employee's spouse, children, parents, grandparents or foster parents, grandchildren, parents-in-law, brothers, sisters, aunts, uncles or cousins.

5. Be of the same gender.

6. Have jointly shared the same regular and permanent residence for at least six months, and have an intent to continue doing so indefinitely.

7. Be jointly responsible for basic living expenses, including the cost of food, shelter and other common expenses of maintaining a household. This joint responsibility need not mean that the persons contribute equally or in any particular ratio, but rather that the persons agree that they are jointly responsible.

The tentative agreement also provides: "In order to establish whether the criteria have been met, the employer may require the employee to sign an Affidavit setting forth the facts and circumstances which constitute compliance with those requirements."

The city of Kalamazoo's "Domestic Partner Benefits Policy," incorporated in its collective-bargaining agreements, provided health-insurance benefits to the domestic partners of the city's employees who met the following criteria:

For the purposes of the City of Kalamazoo's program, the definition and use of the term *domestic partner* shall only include couples of the same sex. To be considered as domestic partners, the individuals must:

A. Be at least 18 and mentally competent to enter into a contract;

B. Share a common residence and have done so for at least six (6) months;

C. Be unmarried and not related by blood closer than would prevent marriage;

D. Share financial arrangements and daily living expenses related to their common welfare;

E. File a statement of termination of previous domestic partnership at least six (6) months prior to signing another Certification of Domestic Partnership. [Emphasis in the original.]

The city also required the employee and his or her domestic partner to sign a notarized certification of domestic partnership that affirmed these criteria. In addition, they were required to provide evidence of "mutual economic dependence," such as a joint lease or mortgage, and evidence of a "common legal residence," such as driver's licenses or voter's registrations. Finally, the city's policy provided: "It is the intent of this program to provide insurance coverage and other benefits to domestic partners of the City of Kalamazoo identical to those provided to spouses of City employees."

For a domestic partner to be eligible for health-insurance benefits under the University of Michigan's "Same-Sex Domestic Partner Policy," the employee and his or her partner must:

- Be of the same sex; and

- Not be legally married to another individual; and

- Not be related to each other by blood in a manner that would bar marriage; and

9

• Have registered or declared the Domestic Partnership in the manner authorized by a municipality or other government entity;[2] and

• Have allowed at least six months to pass since the dissolution of a previous same-sex domestic partnership in the manner authorized by a municipality or other government entity.

Michigan State University provided health-insurance benefits to its employees' domestic partners if the employee and the domestic partner:

1. are [the] same-sex and for this reason are unable to marry each other under Michigan law,

2. are in a long-term committed relationship, have been in the relationship for at least 6 months, and intend to remain together indefinitely,

3. are not legally married to others and neither has another domestic partner,

4. are at least 18 years of age and have the capacity to enter into a contract,

---

[2] The city of Ann Arbor's "Declaration of Domestic Partnership" requires the partners to "declare the following to be true":

1. We are in a relationship of mutual support, caring and commitment.

2. We share the common necessities of life.

3. We are not related by blood in a manner that would bar marriage in the State of Michigan.

4. We are not married or in any other domestic partnership.

5. We are at least 18 years of age and otherwise competent to enter into a contract.

5. are not related to one another closely enough to bar marriage in Michigan,

6. share a residence and have done so for more than 6 months,

7. are jointly responsible to each other for the necessities of life, and

8. provide a signed "partnership agreement" that obligates each of the parties to provide support for one another, and provides for substantially equal division, upon termination of the relationship, of earnings during the relationship and any property acquired with those earnings.[3]

## B. MARRIAGE AMENDMENT

The marriage amendment, Const 1963, art 1, § 25, provides: "To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose."

The primary objective in interpreting a constitutional provision is to determine the original meaning of the provision to the ratifiers, "we the people," at the time of ratification. Justice Cooley has described this rule of "common understanding" in this way:

> For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the

---

[3] When we use the term "domestic partnership" in this opinion, we refer to a partnership that satisfies the criteria contained in one of the domestic-partnership policies described in this opinion.

sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed. [Cooley, Constitutional Limitations (1st ed), p 66.]

Thus, the primary objective of constitutional interpretation, not dissimilar to any other exercise in judicial interpretation, is to faithfully give meaning to the intent of those who enacted the law. This Court typically discerns the common understanding of constitutional text by applying each term's plain meaning at the time of ratification. *Wayne Co v Hathcock,* 471 Mich 445, 468-469; 684 NW2d 765 (2004).

## C. "SIMILAR UNION"

Plaintiffs argue that "the *only* thing that is prohibited by the [marriage] amendment is the recognition of a same-sex relationship *as a marriage*" and that the public employers here are not recognizing a domestic partnership "as a marriage." Plaintiff's brief on appeal (Docket No. 133554), p 23 (emphasis in the original). We respectfully disagree. First, the amendment prohibits the recognition of a domestic partnership "as a marriage *or similar union . . . .*" That is, it prohibits the recognition of a domestic partnership as a marriage or as a union that is similar to a marriage. Second, just because a public employer does not refer to, or otherwise characterize, a domestic partnership as a marriage or a union similar to a marriage does not mean that the employer is not recognizing a domestic partnership as a marriage or a union similar to a marriage. Cf. *id.* at 26 ("In providing benefits to the same-sex partners of their employees, these

12

employers have not *declared* the same-sex partnership to be a marriage or anything similar to marriage.") (emphasis added).[4]

The pertinent question is not whether public employers are recognizing a domestic partnership as a marriage or whether they have declared a domestic partnership to be a marriage or something similar to marriage; rather, it is whether the public employers are recognizing a domestic partnership as a union similar to a marriage. A "union" is "something formed by uniting two or more things; combination; . . . a number of persons, states, etc., joined or associated together for some common purpose." *Random House Webster's College Dictionary* (1991). Certainly, when two people join together for a common purpose and legal consequences arise from that relationship, i.e., a public entity accords legal significance to this relationship, a union may be said to be formed. When two people enter a domestic partnership, they join or associate together for a common purpose, and, under the domestic-partnership policies at issue here, legal

---

[4] Plaintiffs seem to argue that if a public employer had provided health-insurance benefits to spouses, and had defined "spouses" to include domestic partners, this would violate the amendment, but because the public employers here did not refer to domestic partners in this manner, there is no violation. See plaintiffs' brief on appeal (Docket No. 133554), pp 27-29. We do not agree that whether the amendment is violated is a function of what label a public employer chooses to place on the beneficiaries of the benefits. Instead, the only pertinent question is whether the public employer is recognizing a domestic partnership as a union similar to marriage for any purpose.

consequences arise from that relationship in the form of health-insurance benefits.

Therefore, a domestic partnership is most certainly a union.

The next question is whether a domestic partnership is similar to a marriage. Plaintiffs and the dissent argue that because the public employers here do not bestow upon a domestic partnership *all* the legal rights and responsibilities associated with marriage,[5] the partnership is not similar to a marriage. Again, we respectfully disagree. "Similar" means "having a likeness or resemblance, [especially] in a general way; having qualities in common[.]" *Random House Webster's College Dictionary* (1991); see also *White v City of Ann Arbor,* 406 Mich 554, 572-574; 281 NW2d 283 (1979). A union does not have to possess *all* the same legal rights and responsibilities that result from a marriage in order to constitute a union "similar" to that of marriage. If the marriage amendment were construed to prohibit only the recognition of a union that possesses legal rights and responsibilities identical to those that result from a marriage, the language "or similar union" would be rendered meaningless, and an interpretation that renders language meaningless must be avoided. *Sweatt v Dep't of Corrections*, 468 Mich 172, 183; 661 NW2d 201 (2003) (opinion by Markman, J.). Further, the

---

[5] For example, the right to hold property as tenants by the entirety, MCL 557.71; an equal interest in property of every kind acquired during the marriage, MCL 557.204; the right to pension and retirement benefits accrued during the marriage, MCL 552.18; the right to claim an exemption on taxes for spousal

(continued . . .)

14

dissimilarities identified by plaintiffs are not dissimilarities pertaining to the *nature* of the marital and domestic-partnership unions themselves, but are merely dissimilarities pertaining to the *legal effects* that are accorded these relationships. However, given that the marriage amendment prohibits the recognition of unions similar to marriage "for any purpose," the pertinent question is not whether these unions give rise to all the same legal effects; rather, it is whether these unions are being recognized as unions similar to marriage "for any purpose."[6]

For these reasons, we respectfully disagree with the trial court's conclusion that the "criteria [used by the public employers] . . . do not recognize a union 'similar to marriage'" because the "criteria, even when taken together, pale in comparison to the myriad of legal rights and responsibilities accorded to those with marital status." Unpublished opinion of the Ingham Circuit Court, issued

---

( . . . continued)
inheritance, MCL 205.202; and the right to spousal veterans' benefits, MCL 32.49d and MCL 36.31.

[6] Indeed, we agree with plaintiffs and the dissent that marriages and domestic partnerships are dissimilar in many respects. Marriages give rise to many legal rights and responsibilities that domestic partnerships do not. However, we believe the pertinent question for purposes of the marriage amendment is not whether these relationships give rise to identical, or even similar, legal rights and responsibilities, but whether these relationships are similar in nature in the *context* of the marriage amendment. The dissent, *post* at 18 n 50, fails to recognize that the pertinent question here is not whether marriages and domestic partnerships are similar in the abstract, but whether these relationships are similar *for purposes of* the marriage amendment, i.e., for the purpose of a constitutional provision that prohibits the recognition of unions similar to marriage "for any purpose." If they are, then there can be *no* legal cognizance given to the similar relationship.

15

September 27, 2005 (Docket No. 05-368-CZ), p 9. Instead, we agree with the Court of Appeals that "a publicly recognized domestic partnership need not mirror a marriage in every respect in order to run afoul of article 1, § 25 because the amendment plainly precludes recognition of a 'similar union for any purpose.'" *Nat'l Pride*, 274 Mich App at 163.[7]

All the domestic-partnership policies at issue here require the partners to be of a certain sex, i.e., the same sex as the other partner.[8] Similarly, Michigan law requires married persons to be of a certain sex, i.e., a different sex from the other. MCL 551.1 ("Marriage is inherently a unique relationship between a man and a

---

[7] Plaintiffs argue that the marriage amendment was adopted in response to *Baker v State,* 170 Vt 194; 744 A2d 864 (1999), in which the Vermont Supreme Court held that that state is constitutionally required to extend to same-sex couples in a civil union *all* the same benefits and protections that are provided to married couples. Thus, plaintiffs contend that the amendment only prohibits the establishment of "civil unions" that confer the same rights and obligations as does a marriage. However, as explained earlier, a union does not have to confer all the same rights and obligations as does a marriage in order to be "similar" to a marriage. Moreover, it is no less plausible that the amendment was adopted in response to a series of judicial decisions holding that public employers can extend health-insurance benefits to employees' domestic partners. See, e.g., *Tyma v Montgomery Co,* 369 Md 497; 801 A2d 148 (2002); *Heinsma v City of Vancouver,* 144 Wash 2d 556; 29 P3d 709 (2001); *Lowe v Broward Co,* 766 So 2d 1199 (Fla App, 2000); *Crawford v Chicago,* 304 Ill App 3d 818; 710 NE2d 91 (1999); *Slattery v New York City,* 266 AD2d 24; 697 NYS2d 603 (1999); *Schaefer v City of Denver,* 973 P2d 717 (Colo App, 1998).

[8] Indeed, the Michigan State University policy specifically states that the partners must be of the "same-sex and for this reason are unable to *marry* each other under Michigan law[.]" [Emphasis added.]

16

woman.").[9]  In addition, each of the domestic-partnership policies at issue in this

case requires that the partners not be closely related by blood.[10]  Similarly,

Michigan law requires that married persons not be closely related by blood.  MCL

551.3[11] and MCL 551.4.[12]  Although there are, of course, many different types of

relationships in Michigan that are accorded legal significance-- e.g., debtor-

---

[9] See also MCL 551.1 ("A marriage contracted between individuals of the same sex is invalid in this state."); MCL 551.2 ("[M]arriage is a civil contract between a man and a woman . . . ."); MCL 551.3 ("A man shall not marry . . . another man."); MCL 551.4 ("A woman shall not marry . . . another woman."); MCL 551.272 ("This state recognizes marriage as inherently a unique relationship between a man and a woman, . . . and therefore a marriage that is not between a man and a woman is invalid in this state regardless of whether the marriage is contracted according to the laws of another jurisdiction.").

[10] Three of these policies specifically refer to blood relationships that would prevent "marriage."  The city of Kalamazoo's policy provides that the partners cannot be "related by blood closer than would prevent marriage[.]"  The University of Michigan's policy provides that the partners cannot be "related to each other by blood in a manner that would bar marriage[.]"  Michigan State University's plan provides that the partners cannot be "related to one another closely enough to bar marriage in Michigan[.]"

[11] MCL 551.3 provides:

"A man shall not marry his mother, sister, grandmother, daughter, granddaughter, stepmother, grandfather's wife, son's wife, grandson's wife, wife's mother, wife's grandmother, wife's daughter, wife's granddaughter, brother's daughter, sister's daughter, father's sister, mother's sister, or cousin of the first degree, or another man."

[12] MCL 551.4 provides:

"A woman shall not marry her father, brother, grandfather, son, grandson, stepfather, grandmother's husband, daughter's husband, granddaughter's husband, husband's father, husband's grandfather, husband's son, husband's grandson,

(continued . . .)

---

creditor, parent-child, landlord-tenant, attorney-client, employer-employee--marriages and domestic partnerships appear to be the only such relationships that are defined in terms of *both* gender and the lack of a close blood connection.[13] As discussed earlier, "similar" means "having a likeness or resemblance, [especially] in a general way; having qualities in common[.]" *Random House Webster's College Dictionary* (1991). Marriages and domestic partnerships share two obviously important, and apparently unique (at least in combination), qualities in common.[14] Because marriages and domestic partnerships share these "similar"

---

( . . . continued)
brother's son, sister's son, father's brother, mother's brother, or cousin of the first degree, or another woman."

[13] At oral arguments, despite being asked several times to provide an example of another relationship in Michigan defined in terms of both gender and the lack of a close blood connection, plaintiffs' counsel was unable to do so.

[14] Although we believe that these are the core qualities that make marriages and domestic partnerships similar, these relationships are similar in other respects as well. For instance, marriages and domestic partnerships are relationships that only two people may enter into. See MCL 551.5 ("No marriage shall be contracted whilst either of the parties has a former wife or husband living, unless the marriage with such former wife or husband, shall have been dissolved."); OSE policy (domestic partners must "[n]ot have a similar relationship with any other person, and not have had a similar relationship with any other person for the prior six months"); City of Kalamazoo policy (domestic partners must "[f]ile a statement of termination of previous domestic partnership at least six (6) months prior to signing another Certification of Domestic Partnership"); University of Michigan policy (domestic partners must "[h]ave allowed at least six months to pass since the dissolution of a previous same-sex domestic partnership in the manner authorized by a municipality or other government entity"); Michigan State University policy (domestic partners must not be "legally married to others [or have] another domestic partner").

(continued . . .)

In addition, persons involved in either marital or domestic-partnership relationships must undertake obligations of mutual support. See MCL 750.161(1) ("[A] person who being of sufficient ability fails, neglects, or refuses to provide necessary and proper shelter, food, care, and clothing for his or her spouse . . . is guilty of a felony . . . ."); OSE policy (domestic partners must "[b]e jointly responsible for basic living expenses"); City of Kalamazoo policy (domestic partners must "[s]hare financial arrangements and daily living expenses related to their common welfare"); Michigan State University policy (domestic partners must be "jointly responsible to each other for the necessities of life"). Although the University of Michigan policy does not include a mutual-support obligation, it does require the partners to "[h]ave registered or declared the Domestic Partnership," and the city of Ann Arbor's "Declaration of Domestic Partnership" requires the parties to declare that "we are in a relationship of mutual support" and that "we share the common necessities of life."

Further, both marital and domestic-partnership relationships require agreements or contracts as a precondition. See MCL 551.2 ("[M]arriage is a civil contract between a man and a woman, to which the consent of parties capable in law of contracting is essential."); OSE policy (domestic partners must "agree that they are jointly responsible" "for basic living expenses"); City of Kalamazoo policy (domestic partners must be "mentally competent to enter into a contract" and must sign a domestic-partnership agreement); University of Michigan policy (domestic partners must sign a domestic-partnership agreement); Michigan State University Policy (domestic partners must "provide a signed 'partnership agreement'"). See part III(E) of this opinion.

Additionally, both marital and domestic-partnership relationships have a minimum age requirement. See MCL 551.51 ("A marriage in this state shall not be contracted by a person who is under 16 years of age . . . ."); OSE policy (domestic partners must "[b]e at least 18 years of age"); City of Kalamazoo policy (domestic partners must "[b]e at least 18"); Michigan State University policy (domestic partners must be "at least 18 years of age"). Although the University of Michigan's policy does not include an age requirement, it does require the partners to "[h]ave registered or declared the Domestic Partnership," and the city of Ann Arbor's "Declaration of Domestic Partnership" requires the parties to be "at least 18 years of age . . . ."

Further, both marriages and domestic partnerships are relationships of an indefinite duration. That is, they are both ongoing relationships that continue until

19

qualities, we believe that it can fairly be said that they "resembl[e]" one another "in a general way." Therefore, although marriages and domestic partnerships are by no means identical, they are similar. Because marriages and domestic partnerships are the only relationships in Michigan defined in terms of both gender and lack of a close blood connection, and, thus, have these core "qualities in common," we conclude that domestic partnerships are unions similar to marriage.[15]

(. . . continued)

one of the parties takes affirmative action to terminate the relationship. See MCL 552.6 (one must file a complaint for divorce in order to dissolve a marriage); OSE policy (domestic partners must "jointly share[] the same . . . residence . . . and have an intent to continue doing so indefinitely"); City of Kalamazoo policy (domestic partners must "[f]ile a statement of termination of previous domestic partnership . . . prior to signing another Certification of Domestic Partnership"); University of Michigan policy, (domestic partners must "[h]ave allowed at least six months to pass since the dissolution of a previous same-sex domestic partnership in the manner authorized by a municipality or other government entity"); Michigan State University policy (domestic partners must be "in a long-term committed relationship, have been in the relationship for at least 6 months, and intend to remain together indefinitely").

Finally, it seems relevant that all but one of the domestic-partnership policies at issue here require the partners to share a common residence, a circumstance typically defining the marital relationship as well. See OSE policy (domestic partners must "share[] the same regular and permanent residence"); City of Kalamazoo policy, (domestic partners must "[s]hare a common residence"); Michigan State University policy (domestic partners must "share a residence").

[15] It is noteworthy in this regard that the city of Kalamazoo's policy specifically states that "[i]t is the intent of this program to provide insurance coverage and other benefits to domestic partners of the City of Kalamazoo identical to those provided to *spouses* of City employees." [Emphasis added]. Indeed, each of the four policies at issue here specifically refers to marriage or spouses, and the Michigan State University policy specifically refers to *marriage*

(continued . . .)

20

## D. "RECOGNIZED"

The next question concerns whether public employers are truly recognizing a domestic partnership as a union similar to marriage when they provide health-insurance benefits to domestic partners on the *basis of* the partnership. "Recognize" is defined as "to perceive or acknowledge as existing, true, or valid[.]" *Random House Webster's College Dictionary* (1991). When a public employer attaches legal consequence to a relationship, that employer is clearly "recognizing" that relationship. That is, by providing legal significance to a relationship, the public employer is acknowledging the validity of that relationship. When public employers provide domestic partners health-insurance benefits on the basis of the domestic partnership, they are without a doubt recognizing the partnership.[16]

---

( . . . continued)
in three different provisions. If domestic partnerships are not similar to marriage, why would there be the need in each of these agreements to invoke marriage as an apparently analogous or comparable institution?

[16] Plaintiffs themselves acknowledge that public employers recognize a domestic partnership by providing health-insurance benefits to their employees' domestic partners on the basis of the partnership. See plaintiffs' brief on appeal (Docket No. 133554), p 26 ("What these employers have *recognized* . . . is that a relationship exists between one of their employees and another individual."; "in *recognizing* the existence of that relationship and making that relationship the basis for the employment related benefits which are at issue"; "[T]hese institutions may be giving *recognition* to the relationship that exists between their employees and their partners.") (emphasis added and omitted).

## E. "ONLY AGREEMENT"

The next question concerns whether public employers are recognizing an "agreement" when they provide health-insurance benefits to domestic partners. An "agreement" is "the act of agreeing or of coming to a mutual arrangement." *Id.* The city of Kalamazoo's, the University of Michigan's, and Michigan State University's policies require putative partners to sign a domestic-partnership agreement. The OSE's policy requires partners to "agree that they are jointly responsible" "for basic living expenses . . . ." Obviously, if two people have decided to sign a domestic-partnership agreement or have agreed to be jointly responsible for basic living expenses, they have come to a mutual arrangement.[17] Therefore, public employers recognize an agreement when they provide health-insurance benefits to domestic partners on the basis of a domestic partnership.

However, the marriage amendment specifically states that the "only" agreement that can be recognized as a marriage or similar union is the union of one man and one woman. "Only" means "the single one . . . of the kind; lone; sole[.]" *Random House Webster's College Dictionary* (1991). Therefore, a single agreement can be recognized within the state of Michigan as a marriage or similar

---

[17] In addition, all the policies except the University of Michigan's require partners to live together. When two people decide to live together, they have clearly reached a "mutual arrangement."

union, and that single agreement is the union of one man and one woman.  A domestic partnership does not constitute such a recognizable agreement.

## F. "FOR ANY PURPOSE"

Furthermore, the marriage amendment specifically prohibits recognizing "for any purpose" a union that is similar to marriage but is not a marriage.  "Any" means "every; all[.]"  *Id.*  Therefore, if there were any residual doubt regarding whether the marriage amendment prohibits the recognition of a domestic partnership for the purpose at issue here, this language makes it clear that such a recognition is indeed prohibited "for any purpose," which obviously includes for the purpose of providing health-insurance benefits.  Whether the language "for any purpose" is essential to reach the conclusion that health-insurance benefits cannot be provided under the instant circumstances, or merely punctuates what is otherwise made clear in the amendment, the people of this state could hardly have made their intentions clearer.

## G. "BENEFITS OF MARRIAGE"

The marriage amendment begins with a statement of its purpose that is effectively a preamble: "To secure and preserve the benefits of marriage for our society and for future generations of children . . . ."  Plaintiffs argue that the marriage amendment does not prohibit public employers from providing health-insurance benefits to their employees' qualified same-sex domestic partners

because health-insurance benefits do not constitute a benefit of marriage.[18]

However, the marriage amendment contains more than just a statement of purpose.

In full, it states: "To secure and preserve the benefits of marriage for our society

and for future generations of children, the union of one man and one woman in

marriage shall be the only agreement recognized as a marriage or similar union for

any purpose." The latter-- the operative-- part of this provision sets forth how the

ratifiers intended to go about achieving the purposes set forth in the first part,

"secur[ing] and preserv[ing] the benefits of marriage . . . ." This operative part

specifies that public employers must not recognize domestic partnerships for any

purpose. That is, the first part of the amendment states its purpose, and the second

part states the means by which this purpose is to be achieved. Doubtless, there are

those who would disagree about the efficacy of achieving the former purpose by

---

[18] Reasonable people doubtlessly can disagree regarding whether health-insurance benefits are or are not a benefit of marriage. On the one hand, one can argue that health-insurance benefits are not a benefit of marriage because they arise out of the employer-employee relationship rather than the marital relationship, as demonstrated by the fact that not all married couples have health-insurance benefits. On the other hand, one can argue that they are a benefit of marriage, as demonstrated by the fact that a significant number of people obtain such benefits from their spouses' employers while they would be unable to obtain such benefits if they were not married. Resolution of this disagreement depends, in part, on whether the term "benefit of marriage" implies an *exclusive* benefit or merely a *typical* benefit. Nonetheless, for the reasons set forth in this part of our opinion, we believe that the people have resolved this disagreement, or at least rendered it moot, in the operative part of the amendment. There, it is made clear that domestic partnerships will not be given legal cognizance "for any purpose," including presumably for the purpose of providing health-insurance benefits.

the latter means. However, it is not for this Court to decide whether there are superior means for "secur[ing] and preserv[ing] the benefits of marriage," or indeed whether the means chosen in the amendment are ineffectual or even counterproductive. The people of this state have already spoken on this issue by adopting this amendment.[19] They have decided to "secure and preserve the benefits of marriage" by ensuring that unions similar to marriage are not recognized in the same way as a marriage for any purpose.[20]

---

[19] It is also of some interest that the preamble concerning the benefits of marriage was not even on the ballot when the amendment was ratified. The only language on the ballot was the operative part of the amendment. Although we cannot conclude from this fact that the people did not adopt the entire amendment, such a ballot presentation seems to underscore the traditional view of preamble provisions. See n 20 *infra*.

[20] This view of the preamble is consistent with the well-established rule that "the preamble is no part of the act, and cannot enlarge or confer powers, nor control the words of the act, unless they are doubtful or ambiguous . . . ." *Yazoo & M V R Co v Thomas,* 132 US 174, 188; 10 S Ct 68; 33 L Ed 302 (1889); see also *Coosaw Mining Co v South Carolina,* 144 US 550, 563; 12 S Ct 689; 36 L Ed 537 (1892) ("While express provisions in the body of an act cannot be controlled or restrained by the . . . preamble, [it] may be referred to when ascertaining the meaning of a [provision] which is susceptible of different constructions."). That is, a "'preamble no doubt contributes to a general understanding of a [provision], but it is not an operative part of the [provision],'" and "'[w]here the enacting or operative parts of a [provision] are unambiguous, the meaning of the [provision] cannot be controlled by language in the preamble.'" *Nat'l Wildlife Federation v EPA,* 351 US App DC 42, 57-58; 286 F3d 554 (2002) (citations omitted); see also *United States v Emerson,* 270 F3d 203, 233 n 32 (CA 5, 2001) ("'[T]hough the preamble cannot control the enacting part of a [provision], which is expressed in clear and unambiguous terms, yet, if any doubt arise on the words of the enacting part, the preamble may be resorted to, to explain it.'") (citation omitted); *Planned Parenthood of Minnesota v Minnesota,* 910 F2d 479, 482-483 (CA 8, 1990); *White v Investors Mgt Corp,* 888 F2d 1036, 1042 (CA 4, 1989); *Atlantic Richfield*

(continued . . .)

H. EXTRINSIC EVIDENCE

Plaintiffs and the dissent argue that Citizens for the Protection of Marriage, an organization responsible for placing the marriage amendment on the 2004 ballot and a primary supporter of this initiative during the ensuing campaign, published a brochure that indicated that the proposal would not preclude public employers from offering health-insurance benefits to their employees' domestic partners. However, such extrinsic evidence can hardly be used to contradict the unambiguous language of the constitution. *American Axle & Mfg, Inc v Hamtramck*, 461 Mich 352, 362; 604 NW2d 330 (2000) ("[R]eliance on extrinsic evidence was inappropriate because the constitutional language is clear."). As Justice Cooley explained:

> The object of construction, as applied to a written constitution, *is to give effect to the intent of the people in adopting it.* In the case of all written laws, it is the intent of the lawgiver that is to be enforced. But this intent is to be found in the instrument itself. . . . "Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the [lawgiver] should be intended to mean what they have plainly expressed, and

---

( . . . continued)
*Co v United States,* 764 F2d 837, 840 (Fed Cir, 1985); *Hughes Tool Co v Meier,* 486 F2d 593, 596 (CA 10, 1973). Similarly, see *Parker v Dist of Columbia,* 375 US App DC 140, 159-160; 478 F3d 370 (2007) (reasoning that the preamble of the Second Amendment ["[a] well regulated Militia, being necessary to the security of a free State,"] could not override the clear substantive guarantee of the Second Amendment ["the right of the people to keep and bear Arms, shall not be infringed"]), cert gtd *sub nom Dist of Columbia v Heller,* ___ US ___; 128 S Ct 645 (2007); see also *Jacobson v Massachusetts*, 197 US 11, 22; 25 S Ct 358; 49 L Ed 643 (1905) (holding that the preamble of the United States Constitution is not a source of governmental power).

consequently no room is left for construction." [Cooley, Constitutional Limitations (1st ed), p 55 (emphasis in the original), quoted in *American Axle,* 461 Mich at 362.]

When the language of a constitutional provision is unambiguous, resort to extrinsic evidence is prohibited, and, as discussed earlier, the language of the marriage amendment is unambiguous.[21]

In *Michigan Civil Rights Initiative v Bd of State Canvassers,* 475 Mich 903, 903 (2006) (Markman, J., concurring), in which it was alleged that numerous petition signatures had been obtained in support of placing the Michigan Civil Rights Initiative (MCRI) on the ballot by circulators who misrepresented the MCRI, it was emphasized that "the signers of these petitions did not sign the oral

---

[21] Contrary to the dissent's contention, *post* at 12 n 34, the fact that the amendment does not explicitly state that public employers are prohibited from providing health benefits to their employees' domestic partners does not mean that the amendment is "ambiguous." That is, the fact that a constitutional provision does not explicitly set forth every specific action that is prohibited does not mean that such a provision is ambiguous. If that were the case, almost all constitutional provisions would be rendered ambiguous. Rather, as this Court explained in *Lansing Mayor v Pub Service Comm*, 470 Mich 154, 166; 680 NW2d 840 (2004):

> [A] provision of the law is ambiguous only if it "irreconcilably conflict[s]" with another provision or when it is *equally* susceptible to more than a single meaning. In lieu of the traditional approach to discerning "ambiguity"—one in which only a few provisions are truly ambiguous and in which a diligent application of the rules of interpretation will normally yield a "better," albeit perhaps imperfect, interpretation of the law—the dissent would create a judicial regime in which courts would be quick to declare ambiguity and quick therefore to resolve cases and controversies on the basis of something other than the words of the law. [Citation omitted; emphasis in the original.]

representations made to them by circulators; rather, they signed written petitions that contained the actual language of the MCRI." Similarly, the voters here did not vote for or against any brochure produced by Citizens for the Protection of Marriage; rather, they voted for or against a ballot proposal that contained the actual language of the marriage amendment.[22]

---

[22] As an aside, this brochure did not render a verdict on the instant controversy. Rather, it stated:

> Marriage is a union between a husband and wife. Proposal 2 will keep it that way. This is not about rights or benefits or how people choose to live their life. This has to do with family, children and the way people are. It merely settles the question once and for all what marriage is—for families today and future generations.

We do not read this language as resolving that the marriage amendment would not prohibit domestic partners from obtaining health-insurance benefits. Moreover, statements made by other supporters of the amendment stated that partnership benefits would, in fact, be prohibited by the amendment. See amicus curiae brief of the American Family Association of Michigan, pp 6-8.

In addition to the brochure, plaintiffs and the dissent rely on statements made by counsel for Citizens for the Protection of Marriage to the Board of State Canvassers in which he apparently asserted that the amendment would not prohibit public employers from providing health-insurance benefits to domestic partners. *Post* at 9-10, quoting the transcript of the August 23, 2004, hearing before the board, reproduced in the Governor's appendix (Docket No. 133429), p 68a. Whatever the accuracy of this characterization, cf. amicus curiae brief of the American Family Association of Michigan, p 8 n 2, it should bear little repeating that the people ultimately did not cast their votes to approve or disapprove counsel's, or any other person's, statements concerning the amendment; they voted to approve or disapprove the language of the amendment itself.

Moreover, given that the "Board of State Canvassers . . . has the authority only to 'ascertain if the petitions have been signed by the requisite number of
(continued . . .)

Moreover, like the Citizens for the Protection of Marriage, the Michigan Civil Rights Commission issued a statement asserting:

> If passed, Proposal 2 would result in fewer rights and benefits for unmarried couples, both same-sex and heterosexual, by banning civil unions and overturning existing domestic partnerships. Banning domestic partnerships would cause many Michigan families to lose benefits such as health and life insurance, pensions and hospital visitation rights.[23]

---

( . . . continued)
qualified and registered electors,'" *Michigan Civil Rights Initiative,* 475 Mich at 903 (Markman, J., concurring), quoting MCL 168.476(1), we are not sure why the dissent places particular emphasis, *post* at 9 n 22, on the fact that this statement was made before the Board of State Canvassers.

[23] Other opponents made similar statements concerning the adverse consequences of the amendment. See, generally, amicus curiae brief of the American Family Association of Michigan, pp 9-12. The dissent contends that "[i]t is reasonable to assume that the public relied heavily on the proponents of the amendment to explain its meaning and scope." *Post* at 14 n 35. We see no basis for this argument. Contrary to the dissent, it is no more likely that the voters relied on proponents' views rather than opponents' views of the amendment. Indeed, one might conceivably think that at least some of the people would be significantly more likely to rely on an assessment of the amendment from an official agency of the government than from a private organization with an obvious stake in the passage of the amendment. Similarly, it might be expected that at least some might be influenced by the characterizations of newspapers such as the *Detroit Free Press*, in which its political columnist stated in a question-answer format on September 13, 2004:

> *Q*. What about employee benefits accorded to domestic partners and their dependents by some municipalities and public universities?

> *A*. Proponents and opponents of the amendment say they would be prohibited to the extent they mimic benefits for married employees.

(continued . . .)

Therefore, all that can reasonably be discerned from the extrinsic evidence is this: before the adoption of the marriage amendment, there was public debate regarding its effect, and this debate focused in part on whether the amendment would affect domestic-partnership benefits. The people of this state then proceeded to the polls, they presumably assessed the actual language of the amendment in light of this debate, and a majority proceeded to vote in favor.[24] The role of this Court is not to determine who said what about the amendment before it was ratified, or to speculate about how these statements may have influenced voters. Instead, our responsibility is, as it has always been in matters of constitutional interpretation, to determine the meaning of the amendment's actual language.[25]

---

( . . . continued)

Because we cannot read voters' minds to determine whose views they relied on and whose they ignored-- and because in the end this would not be relevant-- we must look to the actual language of the amendment. The dissent inadvertently illustrates the principal infirmity of reliance upon legislative history, namely that it affords a judge essentially unchecked discretion to pick and choose among competing histories in order to select those that best support his own predilections. In relying on what she describes as the "wealth of extrinsic information available," *post* at 12 n 34, the dissenting justice refers only to information supporting her own viewpoint, while disregarding the abundant "wealth of extrinsic information" that does not.

[24] It perhaps can also be discerned that supporters of legislative and constitutional initiatives often tend to downplay the effect of such initiatives during public debate, while opponents tend to overstate their effect.

[25] The dissent chastises us for failing to consider extrinsic evidence, given that we considered such evidence in *People v Nutt,* 469 Mich 565, 588-592; 677 NW2d 1 (2004), and *Lapeer Co Clerk v Lapeer Circuit Court,* 469 Mich 146, 156-160; 665 NW2d 452 (2003). *Post* at 13 n 34. In those cases, we considered the Official Record of the Constitutional Convention and the Address to the People.

(continued . . .)

When the dissent accuses the majority of "condon[ing] and even encourag[ing] the use of misleading tactics in ballot campaigns," *post* at 21, we can only surmise from this that the dissent believes that this Court must defer in its constitutional interpretations, not to the language of the constitution, but to myriad statements from private individuals and organizations, some of which may have ascribed meanings to the constitution utterly at odds with its actual language. We do not believe the people of this state have acquiesced in this delegation of judicial responsibility from the courts to private interest groups.

## I. OTHER STATES

Finally, none of the decisions from other states on which plaintiffs rely is helpful because none involves the specific language contained in Michigan's marriage amendment. See, e.g., *State v Carswell,* 114 Ohio St 3d 210; 871 NE2d 547 (2007) (constitutional provision, Ohio Const art 15, § 11, providing: "Only a union between one man and one woman may be a marriage valid in or recognized by this state and its political subdivisions."); *Knight v Superior Court of*

---

( . . . continued)

These are hardly comparable to campaign statements made by private organizations. Further, we recognized in those cases that "constitutional convention debates and the *Address to the People* . . . are . . . not controlling." *Lapeer Co Clerk,* 469 Mich at 156. To say the least, neither case stands for the dissent's apparent proposition that any stray bit of historical flotsam or jetsam can serve as guidance in giving meaning to the constitution. In a similar vein, the dissent would trump the actual language of the constitution by relying on a telephone survey conducted three months before the election that indicated that a majority of those surveyed were not opposed to domestic-partnership benefits.

31

*Sacramento Co,* 128 Cal App 4th 14; 26 Cal Rptr 3d 687 (2005) (statute, Cal Fam Code 308.5, providing that "[o]nly marriage between a man and a woman is valid or recognized in California"); *Devlin v Philadelphia,* 580 Pa 564; 862 A2d 1234 (2004) (statute, 23 Pa Cons Stat 1704, providing that "marriage shall be between one man and one woman"); *Tyma v Montgomery Co,* 369 Md 497; 801 A2d 148 (2002) (statute, Md Code Ann Fam Law 2-201, providing that "[o]nly a marriage between a man and a woman is valid in this State"); *Heinsma v City of Vancouver,* 144 Wash 2d 556; 29 P3d 709 (2001) (statute, Wash Rev Code 26.04.010(1), providing that "[m]arriage is a civil contract between a male and a female"); *Lowe v Broward Co,* 766 So 2d 1199 (Fla App, 2000) (statute, Fla Stat 741.212(1), providing that "[m]arriages between persons of the same sex entered into in any jurisdiction . . . are not recognized for any purpose in this state"); *Crawford v Chicago,* 304 Ill App 3d 818; 710 NE2d 91 (1999) (statute, 750 Ill Comp Stat 5/201, providing that a marriage is valid if it is "between a man and a woman"); *Slattery v New York City,* 266 AD2d 24; 697 NYS2d 603 (1999) (statute, NY Dom Rel Law 12, providing that "the parties must solemnly declare in the presence of a clergyman or magistrate and the attending witness or witnesses that they take each other as husband and wife"); *Schaefer v City of Denver,* 973 P2d 717 (Colo App, 1998) (statute, Colo Rev Stat 14-2-104(1)(b), providing that a marriage is valid if it is "only between one man and one woman"). As the Washington Court of Appeals explained, "Michigan's marriage amendment is unique from other

jurisdictions because it prohibits the recognition of not only same-sex marriages, but also 'similar unions.'" *Leskovar v Nickels,* 140 Wash App 770, 780; 166 P3d 1251 (2007). "Washington's marriage statute prohibits marriage by 'persons other than a male and a female.' It is distinct from Michigan's marriage amendment, and does not prohibit the recognition of 'similar unions for any purpose.'" *Id.*

The same is true of all the cases cited by plaintiffs-- each is interpreting a provision of law that is simply too different from Michigan's marriage amendment to be of persuasive value in determining how this state's amendment should be interpreted.

## IV. CONCLUSION

The trial court held that providing health-insurance benefits to domestic partners does not violate the marriage amendment because public employers are not recognizing domestic partnerships as unions similar to marriage, given the significant distinctions between the legal effects accorded to these two unions. However, given that the marriage amendment prohibits the recognition of unions similar to marriage "for any purpose," the pertinent question is not whether these unions give rise to all of the same legal effects; rather, it is whether these unions are being recognized as unions similar to marriage "for any purpose." Recognizing this and concluding that these unions are indeed being recognized as similar unions "for any purpose," the Court of Appeals reversed. We affirm its

judgment.[26]  That is, we conclude that the marriage amendment, Const 1963, art 1, § 25, which states that "the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose," prohibits public employers from providing health-insurance benefits to their employees' qualified same-sex domestic partners.

Stephen J. Markman
Clifford W. Taylor
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.

---

[26] Because the other issues addressed by the Court of Appeals were not appealed in this Court, we do not address these.

STATE OF MICHIGAN

SUPREME COURT

NATIONAL PRIDE AT WORK, INC.,
BECKY ALLEN, DORTHEA
AGNOSTOPOULOS, ADNAN AYOUB,
MEGHAN BELLANGER, JUDITH
BLOCK, MARY M. BRISBOIS, WADE
CARLSON, COURTNEY D. CHAPIN,
MICHAEL CHAPMAN, MICHELLE
CORWIN, LORI CURRY, JOSEPH
DARBY, SCOTT DENNIS, JIM
ETZKORN, JILL FULLER, SUSAN
HALSEY-CERAGH, PETER HAMMER,
DEBRA HARRAH, TY HIITHER,
JOLINDA JACH, TERRY KORRECK,
CRAIG KUKUK, GARY LINDSAY,
KEVIN McMANN, A.T. MILLER, KITTY
O'NEIL, DENNIS PATRICK, TOM
PATRICK, GREGG PIZZI, KATHLEEN
POELKER, JEROME POST, BARBARA
RAMBER, PAUL RENWICK, DAHLIA
SCHWARTZ, ALEXANDRA STERN,
GWEN STOKES, KEN CYBERSKI,
JOANNE BEEMON, CAROL BORGESON,
MICHAEL FALK, and MATT SCOTT,

   Plaintiffs-Appellees,

v                No. 133429

GOVERNOR OF MICHIGAN,

   Defendant-Appellant,

and

CITY OF KALAMAZOO,

   Defendant-Appellee,

and

ATTORNEY GENERAL,

       Intervening Defendant-
       Appellee.

_____

NATIONAL PRIDE AT WORK, INC.,
BECKY ALLEN, DORTHEA
AGNOSTOPOULOS, ADNAN AYOUB,
MEGHAN BELLANGER, JUDITH
BLOCK, MARY M. BRISBOIS, WADE
CARLSON, COURTNEY D. CHAPIN,
MICHAEL CHAPMAN, MICHELLE
CORWIN, LORI CURRY, JOSEPH
DARBY, SCOTT DENNIS, JIM
ETZKORN, JILL FULLER, SUSAN
HALSEY-CERAGH, PETER HAMMER,
DEBRA HARRAH, TY HIITHER,
JOLINDA JACH, TERRY KORRECK,
CRAIG KUKUK, GARY LINDSAY,
KEVIN McMANN, A.T. MILLER, KITTY
O'NEIL, DENNIS PATRICK, TOM
PATRICK, GREGG PIZZI, KATHLEEN
POELKER, JEROME POST, BARBARA
RAMBER, PAUL RENWICK, DAHLIA
SCHWARTZ, ALEXANDRA STERN,
GWEN STOKES, KEN CYBERSKI,
JOANNE BEEMON, CAROL BORGESON,
MICHAEL FALK, and MATT SCOTT,

       Plaintiffs-Appellants,

v                              No. 133554

GOVERNOR OF MICHIGAN and CITY
OF KALAMAZOO,

       Defendants,

2

and

ATTORNEY GENERAL,

> Intervening Defendant-
> Appellee,

_____

KELLY, J. (*dissenting*).

The issue we decide is whether the so-called "marriage amendment"[1] of the Michigan Constitution prevents public employers from voluntarily providing health benefits to their employees' same-sex domestic partners. The majority has determined that it does. I disagree.

First, the language of the amendment itself prohibits nothing more than the recognition of same-sex marriages or similar unions. It is a perversion of the amendment's language to conclude that, by voluntarily offering the benefits at issue, a public employer recognizes a union similar to marriage. Second, the circumstances surrounding the adoption of the amendment strongly suggest that Michigan voters did not intend to prohibit public employers from offering health-care benefits to their employees' same-sex partners. The majority decision does not represent "the law which the people have made, [but rather] some other law

_____

[1] Const 1963, art 1, § 25.

3

which the words of the constitution may possibly be made to express."[2]
Accordingly, I dissent.

THE UNDERLYING FACTS

On November 2, 2004, a majority of Michigan voters chose to amend the Michigan Constitution to add § 25 to article 1.[3]  This amendment is sometimes termed the "marriage amendment."  It provides:

> To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.

At the time the amendment was adopted, several public employers in the state had policies that extended health-care benefits to their employees' same-sex domestic partners.  Also, the Office of the State Employer had negotiated an agreement that was to provide domestic-partner benefits to some state employees.[4]

In March 2005, in response to an inquiry, the Attorney General issued a formal opinion that concluded that the amendment prohibited public employers from granting benefits to their employees' same-sex partners.[5]  Five days after the

---

[2] *People v Harding*, 53 Mich 481, 485; 19 NW 155 (1884).

[3] The amendment became effective December 18, 2004.

[4] After the amendment was passed, the interested parties entered into an agreement not to submit the proposed contract to the Civil Service Commission until a court determined whether the benefits were lawful.

[5] OAG ,___, No 7,171, p ___ (March 16, 2005); 2005 Mich Reg 5, p 20.

Attorney General issued the opinion, National Pride At Work, Inc., which is a constituency group of the AFL-CIO, and 41 individuals[6] filed the instant lawsuit against Governor Granholm. The lawsuit sought a declaratory judgment that the amendment does not prohibit public employers from providing the benefits.[7]

The Attorney General, acting on the Governor's behalf, moved to dismiss the suit on the basis that plaintiffs lacked standing. The Governor then obtained separate counsel and withdrew the motion. She proceeded to file a brief supporting plaintiffs' position. This prompted the Attorney General to intervene as a defendant.

Plaintiffs moved for summary disposition, arguing that the amendment does not prohibit public employers from voluntarily providing the benefits at issue. The trial court agreed and granted the motion. The court found that the amendment does not prohibit the benefits because "[b]y voluntarily providing

---

[6] Plaintiffs include employees of (1) the state of Michigan, (2) the city of Kalamazoo, (3) the University of Michigan, (4) Michigan State University, (5) Eastern Michigan University, (6) Wayne State University, and (7) the Eaton/Clinton/Ingham Community Mental Health Board.

[7] Shortly after plaintiffs filed the suit, the city of Kalamazoo indicated that it would not provide benefits to same-sex domestic partners beginning in 2006 unless a court ruled them lawful. In response, Kalamazoo was added to the instant lawsuit as a defendant.

5

domestic partner health care benefits to an employer-defined group of people, the Plaintiffs' employers are not 'recognizing a marriage or similar union.'"[8]

The Attorney General appealed the trial court's decision in the Court of Appeals and moved for a stay. The Court of Appeals granted the stay and, in a unanimous published opinion, reversed the trial court's decision. The panel concluded that the amendment prohibited public employers from granting health benefits to their employees' same-sex domestic partners.[9]

This Court granted leave to appeal to consider the issue.[10]

TWO KEY CONSIDERATIONS

As always, when interpreting the Michigan Constitution, this Court's "duty is to enforce the law which the people have made, and not some other law which the words of the constitution may possibly be made to express."[11] The initial step in determining what law the people have made is to examine the specific language used. In so doing, """"it is not to be supposed that [the people] have looked for any

---

[8] *Nat'l Pride at Work, Inc v Governor*, unpublished opinion of the Ingham Circuit Court, issued September 27, 2005 (Case No. 05-368-CZ). The trial court did not consider the standing issue because the Attorney General did not raise the issue after the Governor withdrew her motion.

[9] *Nat'l Pride at Work, Inc v Governor*, 274 Mich App 147; 732 NW2d 139 (2007).

[10] 478 Mich 862 (2007).

[11] *Harding*, 53 Mich at 485.

6

dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.'""[12] And, since our task is a search for intent, it is often necessary to "consider the circumstances surrounding the adoption of the provision and the purpose it is designed to accomplish."[13]

THE CIRCUMSTANCES SURROUNDING THE ADOPTION OF THE AMENDMENT

Beginning in 1993 with the Hawaii Supreme Court case of *Baehr v Lewin*,[14] a number of state courts and state legislatures joined in a national discussion on the constitutionality of barring same-sex marriages. In *Baehr*, the court held that Hawaii's statute limiting marriage to one man and one woman was presumptively unconstitutional under the Hawaii Constitution. It held that the state had the burden of showing a compelling state interest in limiting marriage to male/female unions.[15] Following *Baehr,* the Vermont Supreme Court issued a decision in 1999 ordering the state legislature to create a legal form that would

---

[12] *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971) (citations omitted).

[13] *Federated Publications, Inc v Michigan State Univ Bd of Trustees*, 460 Mich 75, 85; 594 NW2d 491 (1999).

[14] *Baehr v Lewin,* 74 Hawaii 530; 852 P2d 44 (1993).

[15] *Id.* at 580.

afford same-sex couples a status similar to that of married couples.[16] Then, in 2003, in the famous case of *Goodridge v Dep't of Pub Health*,[17] the Massachusetts Supreme Judicial Court held that barring two people of the same sex from marrying violated the equal protection guarantees of the Massachusetts Constitution.[18] That same year, the California Legislature granted registered domestic partners "the same rights, protections, and benefits . . . as are granted to and imposed upon spouses."[19]

It was against this background that the Michigan Christian Citizens Alliance commenced an initiative to amend the Michigan Constitution to bar same-sex marriage. The alliance formed the Citizens for the Protection of Marriage committee (CPM) "in response to the debate taking place across the country over the definition of marriage."[20] The committee's stated goal was to place the issue of same-sex marriage on the ballot so that Michigan voters would have the ultimate say in the matter.[21]

---

[16] *Baker v State*, 170 Vt 194, 197-198; 744 A2d 864 (1999).

[17] *Goodridge v Dep't of Pub Health,* 440 Mass 309; 798 NE2d 941 (2003).

[18] *Id.* at 312, 342.

[19] Cal Fam Code 297.5(a).

[20] Plaintiff's appendix (Docket No. 133554), p 95c, reproducing a CPM webpage no longer available online.

[21] *Id.*

During CPM's campaign, concerns arose regarding exactly what the amendment would prohibit. CPM attempted to address these concerns at an August 2004 public certification hearing before the Board of State Canvassers.[22] Specifically, CPM addressed whether the amendment, which it had petitioned to place on the ballot, would bar public employers from providing benefits to their employees' same-sex domestic partners. CPM's representative, attorney Eric E. Doster, assured the board that it would not. Mr. Doster stated:

> [T]here would certainly be nothing to preclude [a] public employer from extending [health-care] benefits, if they so chose, as a matter of contract between employer and employee, to say domestic dependent benefits . . . [to any] person, and it could be your cat. So they certainly could extend it as a matter of contract.
>
> * * *
>
> [A]n employer, as a matter of contract between employer and employee, can offer benefits to whomever the employer wants to. And if it wants to be my spouse, if it wants to be my domestic partner—however that's defined under the terms of your contract or my cat, the employer can do that . . . .[23]

Mr. Doster reiterated this point several times throughout the proceedings.

> I'd hate to be repetitive, but again, that's a matter of contract between an employer and employee. And if the employer wanted to do that, offer those benefits, I don't see how this language affects that. If the language just said "marriage" or "spouse," then I would

---

[22] In order for a proposal to be placed on the ballot, the Board of State Canvassers must certify it. MCL 168.476. Thus, the certification hearing was a very important step for CPM.

[23] The Governor's appendix (Docket No. 133429), p 67a-68a, reproducing the transcript of the August 23, 2004, hearing.

agree with you. But there's nothing in this language that I would interpret that would say that that somehow would go beyond that.[24]

In its campaign to win over voters, CPM made a number of additional public statements that were consistent with Mr. Doster's testimony before the Board of State Canvassers. For example, Marlene Elwell, the campaign director for CPM, was quoted in *USA Today* as stating that "[t]his has nothing to do with taking benefits away. This is about marriage between a man and a woman."[25] Similarly, CPM communications director Kristina Hemphill was quoted as stating that "[t]his Amendment has nothing to do with benefits . . . . It's just a diversion from the real issue."[26]

CPM also made clear on its webpage that it was "not against anyone, [CPM is] **for** defining **marriage as the union of one man and one woman**. **Period**."[27] Instead, CPM contended that its reason for proposing the amendment was its belief that "[n]o one has the right to redefine marriage, to change it for everyone

---

[24] *Id.* at 69a.

[25] Charisese Jones, *Gay marriage on ballot in 11 states*, USA Today, October 15, 2004, p A.3.

[26] John Burdick, *Marriage issue splits voters*, Holland Sentinel, October 30, 2004.

[27] Plaintiffs' appendix (Docket No. 133554), reproducing a CPM webpage no longer available online.

else.  Proposal 2 will keep things as they are and as they've been.  And by amending Michigan's constitution, we can settle this question once and for all."[28]

CPM even distributed a brochure that asserted that the amendment would not affect any employer health-benefit plan already in place.  The brochure stated:

> **Proposal 2 is *Only* about Marriage**
>
> Marriage is a union between a husband and wife.  Proposal 2 will keep it that way.  This is not about rights or benefits or how people choose to live their life.  This has to do with family, children and the way people are.  It merely settles the question once and for all what marriage is—for families today and future generations.[29]

It can be assumed that the clarifications offered by CPM, the organization that successfully petitioned to place the proposal on the ballot, carried considerable weight with the public.  Its statements certainly encouraged voters who did not favor a wide-ranging ban to vote for what they were promised was a very specific ban on same-sex marriage.

And a poll conducted shortly before the election indicates that CPM's public position was in line with public opinion.  The poll results indicated that, whereas the public was in favor of banning same-sex marriage, it was not opposed to employer programs granting benefits to same-sex domestic partners.

---

[28] CPM's brochure, Protect Marriage, reproduced in the Governor's appendix (Docket No. 133429), p 30a.

[29] *Id.*

In an August 2004 poll of 705 likely voters,[30] 50 percent of respondents favored the amendment while only 41 percent planned to vote against it. But 70 percent specifically disapproved of making domestic partnerships and civil unions illegal.[31] Sixty-five percent disapproved of barring cities and counties from providing domestic-partner benefits.[32] And 63 percent disapproved of prohibiting state universities from offering domestic-partner benefits.[33]

Accordingly, the circumstances surrounding the adoption of the amendment indicate that the lead proponents of the amendment worked hard to convince voters to adopt it.[34] CPM told voters that the "marriage amendment" would bar

---

[30] For full poll results, see the August 3, 2004, letter from Lake Snell Perry & Associates, Inc., to interested parties, reproduced as exhibit 10 of the amici curiae brief on appeal of various law professors at Michigan public universities.

[31] Twenty-four percent approved of making domestic partnerships and civil unions illegal.

[32] Twenty-seven percent approved of barring cities and counties from providing domestic-partner benefits.

[33] Twenty-nine percent approved of prohibiting state universities from offering domestic-partner benefits.

[34] The majority claims that I rely on extrinsic sources to trump the amendment's language. As I will explain in more detail, my interpretation is consistent with the amendment's language, not a trump card.

The majority attempts to justify its disregard of the extrinsic sources available by concluding that the "marriage amendment" is unambiguous. As can be discerned by any reader of the amendment, the vague language used is ambiguous in regard to the resolution of the question presented by this case. Clearly, the amendment does not unambiguously state whether public employers are barred from providing health benefits to their employees' same-sex partners.
(continued . . .)

12

same-sex marriage but would not prohibit public employers from providing the benefits at issue. It is reasonable to conclude that these statements led the ratifiers to understand that the amendment's purpose was limited to preserving the traditional definition of marriage.[35] And it seems that a majority of likely voters

---

( . . . continued)
It says nothing about these benefits. Accordingly, it is necessary to engage in judicial construction to resolve that question.

Since the amendment is ambiguous in regard to the proper resolution of the issue presented, I disagree with the majority's choice to ignore the extrinsic sources available. Because our goal is to discern the law that the people have made, when extrinsic sources exist that shed light on this intent, I believe it is essential to consider them. And given that every United States Supreme Court justice sitting today considers sources outside the language in ascertaining the correct interpretation of a constitutional provision, my methods are hardly unusual. Accordingly, contrary to the majority's allegations, it is not a "delegation of judicial responsibility from the courts to private interest groups" to consider these extrinsic sources. *Ante* at 31. It is a widely accepted means of interpretation.

But, my personal disagreement with the majority's methodology aside, I find remarkable its decision to turn a blind eye to the wealth of extrinsic information available. Consider the majority's recent forays into constitutional interpretation: The majority did not hesitate to consult outside sources when interpreting a constitutional provision in *People v Nutt*, 469 Mich 565, 588-592; 677 NW2d 1 (2004), and in *Lapeer Co Clerk v Lapeer Circuit Court*, 469 Mich 146, 156-160; 665 NW2d 452 (2003). Though the majority protests my characterization of its actions in these cases, the simple fact remains that its modus operandi is to consider extrinsic sources in some cases but not in others. The seemingly inconsistent approaches of the majority are baffling.

[35] It has been pointed out that, before the election, opponents of the amendment suggested that the amendment would prohibit the benefits at issue. These statements are relevant. But it does not follow that the opponents' suggestion coupled with the election results shows that the people actually intended to prohibit the benefits. First, in determing a law's meaning, one logically assumes that the statements of its drafters and lead supporters carry more

(continued . . .)

13

favored an amendment that would bar same-sex marriage but would go no further.

Therefore, this Court's majority errs by holding that the amendment not only bars same-sex marriage but also prohibits the benefits at issue. The error of the majority decision is confirmed by examining the amendment's language.

THE LANGUAGE OF THE "MARRIAGE AMENDMENT"

The "marriage amendment" provides:

> To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.[36]

It has two parts. The first lists the amendment's purpose: "[t]o secure and preserve the benefits of marriage for our society and for future generations of

---

( . . . continued)

weight than the concerns of those who voted against it. Second, it was the opponents' suggestion that prompted the proponents to publicly state that the amendment would not bar the benefits at issue. Because the proponents' statements were in response to the opponents' suggestion, the statements become even stronger indicators of voter intent. The opponents' suggestion indicates that there was confusion regarding what the amendment would prohibit. It is reasonable to assume that the public relied heavily on the proponents of the amendment to explain its meaning and scope.

The majority is "perplexed" by my conclusion that it is reasonable to afford the statements of the proponents more weight than the statements of the opponents. It appears that they do not agree with me that, if one wishes to understand the meaning of an author's words, the best source is the author himself. The best source is not the author's critics. Similarly, I believe it reasonable to conclude that, in deciding what the amendment's language meant, the people turned to the organization that proposed the amendment. They did not turn to the organizations that were opposed to its approval.

[36] Const 1963, art 1, § 25.

14

children . . . ." The second discusses how that purpose is to be accomplished. Both are relevant in determining whether public employers are prohibited from providing the benefits at issue in this case.

The "marriage amendment" undertakes to accomplish its purpose of protecting the benefits of marriage by providing that "the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose." Through this language, the amendment prohibits the recognition of same-sex "[1] marriage or [2] similar union[s]."

It is clear that the employee-benefit programs at issue do not recognize same-sex marriage. Therefore, if the programs violate the amendment, it must be by recognizing a union similar to marriage. For a union to be "similar" to marriage, it must share the same basic characteristics or qualities of a marriage.[37] Thus, in deciding whether the public employers violate the amendment by providing the benefits at issue, we must first consider what a marriage entails.

Marriage has been called "the most important relation in life . . . ."[38] It "is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes;

---

[37] See OAG, ___, No 7,171, p ___ (March 16, 2005); 205 Mich Reg 5, pp 30-31.

[38] *Maynard v Hill*, 125 US 190, 205; 8 S Ct 723; 31 L Ed 654 (1888).

a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects."[39]

"[B]ut [marriage] is not a pure private contract. It is affected with a public interest and by a public policy."[40] Therefore, the state retains control to define and regulate the marriage union. It does so by defining who is qualified to marry,[41] what must be done for a marriage to take place,[42] and the methods for the solemnification and dissolution of marriage.[43]

And the state confers many rights, benefits, and responsibilities solely as the result of a marriage. As the United States Supreme Court has said, "[t]he relation once formed, the law steps in and holds the parties to various obligations and liabilities."[44] It would take pages to list each of the state statutes that name legal rights and responsibilities that stem from a marriage. Examples of a few are: Each spouse has an equal right to property acquired during the marriage.[45] Each

_____

[39] *Griswold v Connecticut*, 381 US 479, 486; 85 S Ct 1678; 14 L Ed 2d 510 (1965).

[40] *Hess v Pettigrew*, 261 Mich 618, 621; 247 NW 90 (1933).

[41] See MCL 551.1; MCL 551.3; MCL 555.4; MCL 551.5; MCL 551.51.

[42] See MCL 551.101 through 551.103

[43] See MCL 551.7; MCL 551.9; MCL 551.15; MCL 552.104; MCL 552.6 *et seq.*

[44] *Maynard*, 125 US at 211.

[45] MCL 557.204.

spouse has the right to pension and retirement benefits accrued during the marriage.[46] Each spouse has the right to invoke spousal immunity to prevent the other spouse's testimony.[47] And each has the right to damages for the wrongful death of his or her spouse.[48] In addition, there are more than 1,000 federal laws conferring even more benefits and privileges on married couples.[49]

Accordingly, it is obvious that there are two separate elements to marriage: There is the private bond between two people, which the state recognizes by solemnifying the marriage. And there are the benefits, rights, and responsibilities that the state confers on individuals solely by virtue of their status of being married. Both elements are necessary and important components of marriage. Hence, for a union to be similar to marriage, it must mirror more than the manner in which the private bond is recognized. It must also carry with it comparable benefits, rights, and responsibilities.[50]

---

[46] MCL 552.18.

[47] MCL 600.2162.

[48] MCL 600.2922(3)(a).

[49] See plaintiffs' appendix (Docket No. 133554), pp 16c-17c, reproducing a January 31, 1997, letter from Barry R. Bedrick, Associate General Counsel, General Accounting Office, to the Honorable Henry Hyde, Chairman of the United States House Judiciary Committee, pp 1-2.

[50] It is by relying exclusively on the personal commitments expressed in the domestic-partnership agreements that the majority determines that the benefit programs at issue violate the amendment. The majority attempts to justify its

(continued . . .)

17

The employer benefit programs at issue do not grant same-sex couples the rights, responsibilities, or benefits of marriage. The most that can be said is that the programs provide health-insurance coverage to same-sex partners. But health coverage is not a benefit of marriage. Although many benefits are conferred on the basis of the status of being married, health benefits are not among them. Notably absent is any state or federal law granting health benefits to married couples. Instead, the health coverage at issue is a benefit of employment. And the fact that the coverage is conferred on the employee's significant other does not transform it into a benefit of marriage; the coverage is also conferred on other dependents, such as children.

---

( . . . continued)

disregard of the legal incidents that flow from the marital status by relying on the language "for any purpose." It concludes that, because of this language, a union can be similar to marriage even if it carries with it none of the rights, benefits, or responsibilities of marriage. This is preposterous. The language "for any purpose" does not modify the word "similar." It modifies the word "recognize": "the union of one man and one woman in marriage shall be the only agreement *recognized* as a marriage or similar union *for any purpose*." (Emphasis added.) Thus, it is error to conclude that the phrase "for any purpose" alters the word "similar." In any event, as already discussed, the word "similar" requires a comparison of essentials. Essential aspects of a marriage include the legal incidents that flow from it. Therefore, it is not I who misreads the meaning of the word "similar" but the majority. It distorts the amendment's language when it concludes that, in deciding whether a union is similar to marriage, the framers intended we consider solely the personal commitments expressed by individuals. The majority's holding contradicts the amendment's express purpose: "To secure and preserve the benefits of marriage for our society and for future generations of children . . . ." This language indicates that the amendment's drafters and ratifiers did not ignore the important—perhaps more important—rights, benefits, and

(continued . . .)

18

But even if health coverage were a benefit of marriage, it is the only benefit afforded to the same-sex couples in this case. The same-sex couples are not granted any of the other rights, responsibilities, or benefits of marriage. It is an odd notion to find that a union that shares only one of the hundreds of benefits that a marriage provides is a union similar to marriage. It follows that the amendment is not violated because the employee-benefit programs do not constitute recognition of same-sex "marriage or [a] similar union."[51]

Determining that the amendment does not prohibit public employers from providing health benefits to same-sex domestic partners is consistent with the purpose explicitly expressed in the amendment. The amendment's stated purpose is "[t]o secure and preserve the benefits of marriage for our society and for future generations of children[.]" As discussed earlier, the state is not required to provide health benefits to spouses. Therefore, it makes no sense to find that health benefits are benefits of marriage just because some public employers voluntarily provide those benefits to spouses. Instead, the health benefits at issue are benefits of employment. The amendment's stated purpose does not protect or restrict

---

( . . . continued)
responsibilities of marital status. Nor did they intend to equate the sacred benefits of marriage with the mundane benefits of employment.

[51] This conclusion is consistent with the decisions of other state courts that have considered whether providing benefits to same-sex partners violates state laws regulating marriage. E.g., *Slattery v New York City*, 266 AD2d 24; 697

(continued . . .)

19

employment benefits. Therefore, barring public employers from providing the benefits at issue does nothing to further the purpose of the amendment. This is another fact that weighs in favor of my interpretation.

The Attorney General makes much of the fact that the amendment uses the phrase "for any purpose." The Attorney General contends that, as long as one benefit is provided to same-sex couples in the same way that it is provided to married couples, the amendment is violated. The majority accepts this argument. The majority's interpretation of the amendment is problematic because it essentially reads the word "similar" out of the amendment. It construes the amendment to read: "the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or union for any purpose."

The amendment does not prohibit the state from recognizing the validity of same-sex unions for any purpose. It prohibits the state from recognizing a same-sex marriage or a same-sex union that is similar to a marriage for any purpose. Accordingly, unless the state recognizes a same-sex marriage or a same-sex union that is similar to a marriage, the "for any purpose" language has no application. The majority fails to recognize this point.

CONCLUSION

---

( . . . continued)
NYS2d 603 (1999); *Tyma v Montgomery Co*, 369 Md 497; 801 A2d 148 (2002); *Lowe v Broward Co*, 766 So 2d 1199 (Fla App, 2000).

20

The majority decides that the "marriage amendment" prevents public employers from voluntarily entering into contractual agreements to provide health benefits to their employees' same-sex domestic partners. Its decision is contrary to the people's intent as demonstrated by the circumstances surrounding the adoption of the amendment and as expressed in the amendment's language. For those reasons, I must dissent.

Furthermore, by proceeding as it does, the majority condones and even encourages the use of misleading tactics in ballot campaigns by ignoring the extrinsic evidence available to it. CPM petitioned to place the "marriage amendment" on the ballot, telling the public that the amendment would not prohibit public employers from offering health benefits to their employees' same-sex domestic partners. Yet CPM argued to this Court that the "plain language of Michigan's Marriage Amendment" prohibits public employers from granting the benefits at issue.[52] Either CPM misrepresented the meaning of the amendment to the State Board of Canvassers and to the people before the election or it misrepresents the meaning to us now. Whichever is true, this Court should not

---

[52] Amicus curiae brief on appeal of Citizens for the Protection of Marriage, p 1.

21

allow CPM to succeed using such antics. The result of the majority's disregard of CPM's preelection statements is that, in the future, organizations may be encouraged to use lies and deception to win over voters or the Court. This should be a discomforting thought for us all.

Marilyn Kelly
Michael F. Cavanagh